**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **AMERICAN AIRLINES, INC.,** | § | |
| | § | |
| **Plaintiff/Petitioner,** | § | |
| | § | |
| **v.** | § | No. 4:12-CV-00083-Y |
| | § | |
| **ALLIED PILOTS ASSOCIATION,** | § | |
| | § | |
| **Defendant/Respondent.** | § | |

<u>**MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**</u>

Dee J. Kelly
State Bar No. 11217000
Roger C. Diseker
State Bar No. 00787371
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: (817) 332-2500
Facsimile: (817) 878-9280
Email: dee.kelly@kellyhart.com
Email: roger.diseker@kellyhart.com

**ATTORNEYS FOR PLAINTIFF**
**AMERICAN AIRLINES, INC.**

## TABLE OF CONTENTS

**PAGE**

I.   Live Pleadings ...........................................................................................................1

II.   Summary ...................................................................................................................1

III.   Grounds On Which Summary Judgment Sought ....................................................2

IV.   Statement Of Undisputed Facts ..............................................................................2

    A.   The Collective Bargaining Agreement At Issue. ........................................2

    B.   Mr. Minkin's Discharge ...............................................................................3

    C.   American's Transition Training Program. ....................................................3

    D.   Minkin Completed the Qualification Phase ................................................4

    E.   Minkin Failed the Operating Experience Phase Because of Pronounced Safety-Related Deficiencies ........................................................................5

    F.   Minkin's Poor Airmanship Was Just Cause to Terminate His Employment ...........7

    G.   The Grievance and System Board Decision ................................................8

V.   Argument .................................................................................................................10

    A.   Summary of Argument ...............................................................................10

    B.   Scope Of Individual Review Of System Board Awards Under The RLA ............11

        1.   Scope of Review ............................................................................11

        2.   Summary Judgment Standard ........................................................11

    C.   The Arbitrator Exceeded His Jurisdiction By Reinstating An Unsafe Pilot After Finding Just Cause For Termination ..............................................12

    D.   The Arbitrator Disregarded Public Safety By Ordering The Reinstatement Of An Unsafe Pilot........................................................................15

    E.   The Arbitrator Exceeded His Jurisdiction By Considering Section 17.P Of The CBA And Then Misconstruing Section 17.P. ..............................17

        1.   The Arbitrator Exceeded His Jurisdiction By Considering And Ruling On A Matter Not Properly Before Him .........................17

## TABLE OF CONTENTS CONT.

**PAGE**

      2.    The Arbitrator Exceeded His Jurisdiction By Misconstruing Section 17.P. ..............................................................................19

F.    The Arbitrator Violated American's Due Process Rights.....................................20

VI.    Conclusion ......................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Air East, Inc. v. Nat'l Transp. Safety Bd.*,
  512 F.2d 1227 (3d Cir. 1975), *cert. denied*, 423 U.S. 863 (1976)..........................................15

*American Eagle Airlines, Inc. v. Air Line Pilots Ass'n*,
  343 F.3d 401 (5th Cir. 2003) .....................................................................................12, 14, 20

*Anderson v. Liberty Lobby*,
  477 U.S. 242 (1986).................................................................................................................11

*Atchison, Topeka and Santa Fe Ry. Co. v. United Transp. Union*,
  175 F.3d 355 (5th Cir. 1999) ...................................................................................................11

*Brotherhood of Locomotive Engineers v. St. Louis Southwestern Ry. Co.*,
  757 F.2d 656 (5th Cir. 1999) ...................................................................................................11

*Bruce Hardwood Floors v. UBC*,
  103F.3d 449 (5th Cir. 1997) ....................................................................................................19

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).................................................................................................................11

*Container Products Inc. v. United Steel Workers of America*,
  873 F.2d 818 (5th Cir. 1989) .............................................................................................13, 19

*Delta Queen Steamboat Co. v. District 2 Marine Engineers Beneficial Ass'n, AFL-CIO*,
  889 F.2d 599 (5th Cir. 1989), cert. denied, 111 S. Ct. 148 (1990) .............................12, 13, 19

*E.I. DuPont de Nemours and Co. v. Local 900 of Intern. Chem. Workers Union*,
  968 F.2d 456 (5th Cir. 1992) .............................................................................................13, 19

*Eastern Associated Coal Corp. v. United Mine Workers of America Dist. 17*,
  531 U.S. 57 (2000)..............................................................................................................12, 15

*Exxon Corp. v. Baton Rouge Oil*,
  77 F.3d 850 (5th Cir. 1996) .....................................................................................................19

*Hall v. Eastern Air Lines, Inc.*,
  511 F.2d 663 (5th Cir. 1975) (per curiam).............................................................................21

*Houston Lighting & Power Co. v. I.B.E.W.*,
  71 F.3d 179 (5th Cir. 1995) .....................................................................................................19

# TABLE OF AUTHORITIES CONT.

**Page(s)**

**FEDERAL CASES**

*Johnson v. American Airlines, Inc.*,
  745 F.2d 988 (5th Cir. 1984) ...............................................................................................15

*Matsushita Elec. Indus. Co. v. Zenith Radio*,
  476 U.S. 574 (1986)............................................................................................................11

*Murnane v. American Airlines*,
  667 F.2d 98 (D.C. Cir. 1981), *cert. denied*, 456 U.S. 915 .....................................................16

*Robinson v. American Airlines, Inc.*,
  908 F.2d 1020 (D.C. Cir. 1990)..........................................................................................15

*Spurlock v. United Air Lines*,
  475 F.2d 216 (10th Cir. 1972) ............................................................................................16

*Union Pacific R.R. Co. v. Sheehan*,
  439 U.S. 89 (1978) (*per curiam*) .........................................................................................11

*United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*,
  484 U.S. 29 (1987)........................................................................................................11, 15

*W.R. Grace & Co. v. Rubber Workers*,
  461 U.S. 757 (1983).............................................................................................................15

*World Airways, Inc. v. IBT, Airline Division*,
  578 F.2d 800 (9th Cir. 1978) ...............................................................................................15

**FEDERAL STATUTES**

45 U.S.C. § 151 *et seq*..............................................................................................................2

45 U.S.C. Sec. 153, First (q) ..................................................................................................11

49 U.S.C. § 44702(b)(1)(A)...................................................................................................15

TO THE HONORABLE TERRY R. MEANS, UNITED STATES DISTRICT COURT JUDGE:

Plaintiff/Petitioner American Airlines, Inc. ("American") files this Motion for Summary Judgment and Brief in Support and would respectfully show the Court as follows:

## I.
## LIVE PLEADINGS

A.  Complaint For Review and Vacation of Arbitration Award, filed on February 10, 2012, Docketed Item #1;

B.  Answer to Complaint and Counterclaim for Enforcement of Arbitration Award, filed on March 13, 2012, Docketed Item #5; and

C.  Answer to Counterclaim, filed on April 3, 2012, Docketed Item #11.

## II.
## SUMMARY

American Airlines ("American") moves for summary judgment on all the claims in its Complaint for Review and Vacation of an Arbitration Award.  The Arbitration Award has ordered American to reinstate a pilot American fired because he was unsafe.  American terminated Ronald Minkin because of airmanship deficiencies and safety problems that became apparent while Captain Minkin was attempting to transition from the Super 80 to the Boeing 757/767 aircraft.  Defendant Allied Pilots Association ("APA" or "the Union") acknowledged at the arbitration hearing that Minkin was unable to complete the transition program.  Minkin received an extraordinary level of support and assistance from American aimed at helping him succeed.  American was, therefore, justified in terminating him from the transition program. Thus, Minkin's termination was for cause; however, the Arbitrator imposed his own brand of industrial justice to order American to reinstate Minkin as a captain of the Super 80 aircraft. American challenges the Award because the Arbitrator exceeded his jurisdiction and because returning an unsafe pilot to any cockpit is a danger to American and its passengers, thus violating public policy.

## III.
## GROUNDS ON WHICH SUMMARY JUDGMENT SOUGHT

American moves for summary judgment on the following grounds:

1.    The Arbitrator exceeded his jurisdiction by ordering the reinstatement of an unsafe pilot.

2.    The Arbitrator disregarded public safety by ordering the reinstatement of an unsafe pilot.

3.    The Arbitrator exceeded his jurisdiction by considering Section 17.P of the CBA and then misconstruing Section 17.P.

4.    The Arbitrator violated American's due process rights.

## IV.
## STATEMENT OF UNDISPUTED FACTS

American is a certificated air carrier, providing transportation on domestic and international routes.  As of December 1, 2011, American operated a fleet of over 600 jet aircraft. American is a "common carrier" by air and is therefore subject to the provisions of the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq*.

**A.    The Collective Bargaining Agreement At Issue.**

American and APA are parties to a collective bargaining agreement that went into effect on May 1, 2003.  At all pertinent times, the CBA has remained in effect.  [CBA § 1-1; Appx. 232 and APA Feb. 3, 2011 Letter; Appx. 257]  The RLA requires that grievances that arise under the CBA be resolved by arbitration.  [CBA § 23-1 A; Appx. 249]  The CBA creates a System Board of Adjustment to resolve grievances that arise under the CBA.  [*Id.*]  CBA Section 23.E provides that the Board may only resolve disputes between an employee and American that arise under the Agreement—the Board has no jurisdiction to alter or amend the CBA.  [CBA § 23-2 E; Appx. 250]

**B.     Mr. Minkin's Discharge.**

Ronald Minkin was a captain for American, flying the Super 80 aircraft type from the San Francisco crew base.  [Arb. Tr. Vol. 1, 12:21-23; Appx. 30 and Arb. Tr. Vol. 2, 164:21-25; Appx. 105]  In 2009, Minkin, pursuant to the CBA, successfully "bid" for the opportunity to give up his Captain's position on the Super 80 to transition to Captain on the larger 757/767 aircraft type.  [Arb. Tr. Vol. 1, 12:24-13:1; Appx. 30]  Minkin's successful bid, which was voluntary and resulted in a higher pay rate, also meant his new crew base became the Los Angeles base, and his supervisor became the Chief Pilot of that crew base, Captain Greg Smith.  [Arb. Tr. Vol. 1, 12:21-13:1; Appx. 30 and Arb. Tr. Vol. 2, 164:21-25; Appx. 105]

**C.     American's Transition Training Program.**

American has an FAA-approved program that a Captain must successfully complete in order to transition to the 757/767.  [Arb. Tr. Vol. 1, 11:2-6; 13:2-7; Appx. 30]  This transition program has two phases.  [Arb. Tr. Vol. 1, 13:23; Appx. 30]  First, the Captain must complete the "qualification phase," which sometimes is also referred to as the "training phase."  [Arb. Tr. Vol. 1, 13:23-14:1; Appx. 30-31]  To become qualified, the Captain must complete and pass classroom instruction, then simulator training, and finally a simulator "check ride."  [Arb. Tr. Vol. 1, 14:2-20; Appx. 31]  If the Captain successfully completes this first phase, he becomes FAA "qualified" for the 757/767.  [Arb. Tr. Vol. 1, 15:14-24; Appx. 31]  This is recognized by his being issued an FAA Air Transport Pilot Certificate type-rating on the aircraft type, which is also referred to as obtaining an FAA "ticket."  [*Id.*]  The ticket literally states that the pilot is "qualified" and specifically designates an aircraft type(s) (such as the 757/767) on which the pilot is qualified.  [Arb. Tr. Vol. 1, 78:3-9; Appx. 47]

After the pilot obtains the FAA qualification "ticket," he moves onto the second phase—the "Operating Experience" ("OE") phase.  [Arb. Tr. Vol. 1, 15:25-16:6; Appx. 31]  The OE phase for the 757/767 aircraft type takes place on an actual aircraft that the transitioning Captain flies in revenue service (with passengers) under the observation of a Check Airman.[1]  [Arb. Tr. Vol. 1, 15:25-16:6; Appx. 31]  The transitioning Captain continues to fly with a check airman on board each of his OE flights until he completes the transition program or he is determined unable to do so.  [Arb. Tr. Vol. 1, 15:25-16:21; Appx. 31]  If American determines, based on OE phase performance, that a pilot is no longer able to safely and competently serve as a pilot, the Company has a right to terminate his employment.  [Arb. Tr. Vol. 1, 11:10-14; Appx. 30]  Termination occurred under the past practices under the CBA, and the APA acknowledges in its own literature that pilots who are unable to complete an FAA-approved program, such as the program that Minkin was in, are subject to termination.  [Arb. Tr. Vol. 1, 11:10-14; Appx. 30 and APA Pamphlet; Appx. 266-67; and APA Membership Magazine pp. 15-16; Appx. 270-71]

## D.   Minkin Completed the Qualification Phase.

Minkin started his qualification phase on about January 28, 2010 and completed "ground school" on about February 12, 2010.  [Timeline, p. 1; Appx. 256]  He successfully completed the simulator training and, on March 24, 2010, passed a simulator check ride and obtained his FAA "ticket" for the 757/767.  [*Id.*]  Minkin's "ticket" stated that he was "qualified" on the Boeing 757/767 aircraft.  [Arb. Tr. Vol. 1, 15:14-24; Appx. 31]

---

[1]     "Check Airmen" are pilots employed by American, who, in addition to being on the APA seniority list under the CBA, conduct evaluations and observations of other pilots who are in training or "operating experience" phases.  Check Airmen have special training, experience, and authority and are authorized and approved by the FAA, pursuant to its regulations, to conduct this special role.  [Declaration of Bill Peterson at ¶ 2; Appx. 302]

**E.     Minkin Failed the Operating Experience Phase Because of Pronounced Safety-Related Deficiencies.**

Having become "qualified" to fly the 757/767, Minkin moved on to the OE portion of the transition, which must be successfully completed before a pilot can fly the aircraft without a Check Airman in the cockpit observing the transitioning pilot's performance.  [Arb. Tr. Vol. 1, 15:25-16:6; Appx. 31]   Minkin, however, failed the OE phase, even though he received an extraordinary level of additional assistance aimed at helping him succeed.  [Arb. Tr. Vol. 1, 25:7-38:25; Appx. 33-34]   Four separate Check Airmen were assigned to fly with Minkin during his four OE trips—each of which consisted of at least two separate flights.  [Arb. Tr. Vol. 1, 16:22-21:8; Appx. 31-32]   Each Check Airman noted numerous problems with Minkin's airmanship, including serious safety deficiencies.  [*Id.*]   The Check Airmen felt that Minkin failed to demonstrate sufficient ability to safely pilot the aircraft without a Check Airman on board.  [*Id.*]

Minkin's first OE trip was a multi-day trip to Hawaii and back to the U.S. mainland, beginning on April 9, 2010.  [Arb. Tr. Vol. 1, 16:22-17:10; Appx. 31]   The trip was guided by Check Airman Reitz, who noted deficiencies in Minkin's airmanship.  [*Id.*]   Minkin's second OE trip started on April 14, 2010.  [Arb. Tr. Vol. 1, 17:11-19:1; Appx. 31-32]   Minkin's flying was guided by Check Airman Griffin, who noted very serious safety deficiencies in Minkin's airmanship.  [*Id.*]   Minkin's third OE trip started on April 21, 2010.  [Arb. Tr. Vol. 1, 19:2-11; Appx. 32]   Minkin's flying was observed and guided by Check Airman Leng, who also noted concerns with Minkin's airmanship.  [*Id.*]

At this point, American convened a "Performance Review Committee" ("PRC") meeting to discuss Minkin's airmanship and flight safety problems.  [Arb. Tr. Vol. 1, 19:12-24; Appx. 32]   The PRC, with a union pilot member attending, decided to give Minkin additional simulator time, which he received on May 16, 2010.  [Arb. Tr. Vol. 1, 19:25-20:9; Appx. 32]   He was then

offered another opportunity to return to the OE phase.  [Arb. Tr. Vol. 1, 20:10-14; Appx. 32]  On May 19, 2010, Minkin began his fourth OE trip.  [Arb. Tr. Vol. 1, 20:25-21:8; Appx. 32] Minkin's flying was observed by Check Airman Linquist, who also noted airmanship deficiencies.  [*Id.*]

On May 27, 2010, American reconvened the PRC due to Minkin's ongoing problems and offered Minkin a medical evaluation ("AAbilities Clinic").  [Arb. Tr. Vol. 1, 21:19-22:3; Appx. 32-33]  On June 4, 2010, Minkin went to the AAbilities Clinic, which identified no medical problems. [Arb. Tr. Vol. 1, 22:10-23:24:1; Appx. 33]  Minkin concurred and never blamed his poor performance on medical issues.  On August 24-25, 2010, Minkin had two refresher simulator sessions.  [Arb. Tr. Vol. 1, 24:5-25:16; Appx. 33]  On September 4-5, 2010, he was offered additional ground school, in the hope that it might help his OE performance.  [Arb. Tr. Vol. 1, 25:17-21; Appx. 33]   On September 7-9, 2010, Minkin had three more simulator sessions, which were also offered in the hope that it would help his performance; however, his performance remained unsatisfactory.  [Arb. Tr. Vol. 1, 26:5-27:7; Appx. 34]

On September 16, 2010, American convened a "Systems Review Board" ("SRB") to consider Minkin's ongoing inability to complete OE.  [Arb. Tr. Vol. 1, 27:18-28:5; Appx. 34] The SRB was chaired by Minkin's Chief Pilot, Captain Smith, and was attended by Union representatives who were pilots.  [*Id.*]   Minkin did not attend this meeting.  [*Id.*]  It was determined that, based on Minkin's safety and airmanship issues, he must not be allowed to complete the transition to the 757/767.  [Arb. Tr. Vol. 1, 28:6-29:12; Appx. 34]   He had exhausted the assistance American, in good faith, had given him.  [*Id.*]  He had been given a total of almost 50 hours[2] of Operating Experience time on four OE trips involving numerous revenue

---

[2]       The standard amount of OE time to complete the transition process is 25 hours.  [Arb. Tr. Vol. 1, 16:7-21; Appx. 31]

flights, as well as supplemental classroom and simulator instruction.  [Arb. Tr. Vol. 1, 17:6-27:7; Appx. 31-34]  Despite the extra assistance and opportunities, Minkin was unable to satisfactorily complete the transition program.  [*Id.*]

## F.      Minkin's Poor Airmanship Was Just Cause to Terminate His Employment.

Captain Smith, mindful of American's safety obligations, determined that the only appropriate response, given Minkin's documented airmanship deficiencies, was to terminate Minkin's employment.[3]  [Arb. Tr. Vol. 1, 29:1-30:5; Appx. 34-35 and Arb. Tr. Vol. 2 184:1-4; Appx. 110]  Captain Smith scheduled a meeting to discuss the matter with Minkin.  [Arb. Tr. Vol. 1, 29:13-30:5; Appx. 34]  Minkin refused to attend.  [*Id.* and Letter of Termination, p. 1; Appx. 259]  Captain Smith terminated Minkin effective October 6, 2010.  [Letter of Termination, p. 1-2; Appx. 259-60]  The Termination Letter contained an almost full-page recitation of the transition training, supplemental training, retraining, and medical evaluation given to Minkin. [*Id.*]  The Letter concludes that Minkin had to be terminated:

> The SRB concluded that you do not possess the foundation of skills necessary to meet the requirements to successfully complete training.[4]  The amount of time devoted to your training was far in excess of the normal process.  Unfortunately, even with the additional training, you failed to consistently demonstrate that you are capable of qualifying for the position of 757/767 Captain.
>
> Failure to qualify to perform one's duties is grounds for termination.  I regret to inform you that based on your failure to demonstrate the proficiency necessary to satisfactorily perform the duties required of a 757/767 Captain with American Airlines, and your failure to provide any reasonable expectation you can be trained to do so, you are terminated from your employment with American Airlines effective October 6, 2010…

[*Id.*]

---

[3]      Captain Smith testified that "the difficulties that [Minkin] experienced during the OE phase related not to the newness of an aircraft but to basic airmanship and below-average captain skills.  That would relate to any airplane, not just the Boeing 757/767."  [Arb. Tr. Vol. 2, 191:24-192:4; Appx. 112]

[4]      Smith's generic use of the term "training" referred to the **entire** transition program, including OE.  [Arb. Tr. Vol. 2, 188:2-11; Appx. 111]  A more technical usage applies that term only up to the point in the transition program at which the pilot has qualified to begin OE.

**G.      The Grievance and System Board Decision.**

APA filed a grievance on Minkin's behalf, asserting the following grounds:

Whether the Company had just cause to terminate the employment of Captain Ronald Minkin based on the reasons described by Captain Greg Smith, Director of Flight-LAX in his letter dated October 6, 2010, and based on the facts of this case, the Agreement, and past practice?   If not, what is the appropriate remedy?

[Grievance, p. 1; Appx. 257]

At the arbitration hearing, APA asserted an unpled grievance claim, based on Section 17.P of the CBA, that American should have returned Minkin to his former Super 80 Captain position.[5]   [Arb. Tr. Vol. 1, 39:19-41:23; Appx. 37]  Section 17.P does not apply to the OE—it applies only in limited situations where a pilot cannot complete the first "qualification" phase of the transition—a fact that APA acknowledged by not making it a part of the grievance. [Grievance, pp. 1-2; Appx. 257-58]  The grievance did not claim that 17.P required the Company to place Minkin back into a Super 80 Captain position.[6]   [*Id.*]

---

[5]        Section 17.P states:

When a successful bidder fails to qualify for an awarded bid status within thirty (30) days from the effective date of the award—subject to weather, equipment availability, or extent of qualification requirements—such pilot shall forthwith return to his or her former bid status at such pilot's own expense.  The unfilled vacancy shall then be considered a new vacancy.

[CBA § 17-11 P; Appx. 243-44]  Section 17.P uses the word "qualify."  This refers to the qualification phase.  For pilots who are in the qualification phase, 17.P can be applied by the Company to remove the pilot from the qualification phase and place the pilot back to his former position.  This provision has only been used in cases where the pilot's failure to qualify within 30 days has been based on a serious personal illness or family emergency.   [Arb. Tr. Vol. 2, 189:20-190:13; Appx. 111-12 and Examples of Appropriate Application of Section 17.P; Appx. 272-97] American introduced documents evidencing past application of Section 17.P.  [Arb. Tr. Vol. 3, 389:5-409:16; Appx. 196-201]  Kenneth Blessum, a senior analyst in crew resources, gathered these examples of the application of Section 17.P and explained that these documents indicate why the pilot could not complete the training phase within 30 days. [*Id.*]

[6]        Notably, an APA representative raised 17.P in a self-serving *letter* to the Company shortly *before* Minkin was discharged, claiming that 17.P applied to Minkin's situation and that based on 17.P Minkin should be placed back into his former Super 80 Captain position.  [Sept. 15, 2012 Letter; Appx. 298-301]  This was unprecedented— never before had the Union ever asserted that 17.P required a pilot failing his OE phase to be placed back into his former position.

---

At the arbitration hearing, APA's opening statement indicated that it would rely on Section 17.P to seek Minkin's reinstatement as a Super 80 captain. [Arb. Tr. Vol. 1, 39:19-41:23; Appx. 37] American explained to the Arbitrator that no issue involving 17.P was in the grievance or submission and made clear that American did not agree to arbitrate a 17.P issue. [Arb. Tr. Vol. 1, 31:1-33:4; Appx. 35 and Arb. Tr. Vol. 1, 115:5-116:1; Appx. 56] The Arbitrator overruled American and allowed APA to pursue its unpled case. [Arb. Tr. Vol. 1, 118:4-119:23; Appx. 57 and Declaration of Gregg Formella at ¶ 6; Appx. 308] The Arbitrator explained his decision to expand his jurisdiction to include the new claim:

> While it is true that there was no mention of Section 17.P in the grievance or the Submission to the System Board, it is clear that the Company was on notice that the Union took the position that Section 17.P was relevant to Captain Minkin's situation. To find in favor of the Company because Section 17.P was not mentioned in either the grievance or the Submission to the System Board would clearly place form over substance.

[Award, p. 13; Appx. 15]

There was no dispute that American could, and did, find Minkin to be an unsafe pilot because of his poor airmanship.[7] [Award, p. 11; Appx. 13] APA "conceded that Captain Minkin did not successfully complete the 757/767 transition training." [Award, p. 11; Appx. 13 and Arb. Tr. Vol. 1, 114:8-12; Appx. 56] Under the practice American has followed with pilots transitioning to heavy aircraft, a pilot was subject to termination for failing OE. [Arb. Tr. Vol. 1, 11:10-14; Appx. 30 and Arb. Tr. Vol. 1, 66:3-11; Appx. 44] As Captain Smith's termination letter indicated, Captain Minkin's poor airmanship was more than enough to justify his termination.[8] [Termination Letter, pp. 1-2; Appx. 259-60]

---

[7]    In fact, Captain Smith testified that "when the determination is made that the issues we were talking about were related to basic airmanship related to below-average captain skills, **the idea of putting [Minkin] back in any other airplane would be ludicrous**." [Arb. Tr. Vol. 2, 201:22-202:2; Appx. 114-15 (emphasis added)]

[8]    Captain Smith testified that "American Airlines has the full burden of liability for the safe transport of passengers, and that I am responsible for those pilots who conduct the flights domiciled in Los Angeles. In my

While neither party mentioned 17.P in their grievance or submission, the Arbitrator side-stepped the issue by reframing APA's Question at Issue to allow for Minkin's reinstatement, despite his documented poor airmanship:

> It is clear from a review of the record and the briefs of the parties that the System Board must decide whether Section 17.P applies to the Grievant's situation.  If it does, then the termination of the Grievant was in violation of the Agreement and, therefore, was not for just cause.  On the other hand, if it is found that Section 17.P does not apply to the instant case, then termination of the Grievant must be found to be for just cause.

[Award, p. 111; Appx. 13]

The Arbitrator took no issue with American's determination that Minkin's poor piloting skills, standing alone, constituted just cause to terminate.  [*Id.*]  The Arbitrator also conceded that "if it is found that 17.P does not apply to the instant case, then termination of the Grievant must be found to be for just cause."  [*Id.*]  Yet, even though the Arbitrator did not have jurisdiction to consider or rule on Section 17.P's application to this case, he also found that Minkin's failure to complete the OE phase of the transition program meant that, under 17.P, Minkin could simply return to the Super 80 and collect all loss of wages and benefits.  [Award, p. 20; Appx. 22]

## V.
## ARGUMENT

### A.      Summary of Argument.

If an award exceeds the System Board's ("SB") jurisdiction, it can be vacated under the RLA.  By overturning a discharge based upon just cause, the SB violated the CBA and exceeded its authority.  In addition, an arbitration award can be overturned if the award or its enforcement

---

opinion, because of the performance in the 75/76, to place [Minkin] in any other aircraft, when his problems were not related to a new aircraft but were related to basic airmanship, would have been wrong.  I know that the union shares no burden of liability.  American has it all, and I represent that I have a fiduciary responsibility to American."  [Arb. Tr. Vol. 2, 210:24-211:11; Appx. 117].  The Arbitrator then purported to strike this portion of Smith's testimony from the record based on the Arbitrator's mistaken application of Section 17.P to the proceedings.  [Arb. Tr. Vol. 2, 211:12-25; Appx. 117]

would violate public policy.  The United States's public policy is to maintain air travel safety and to protect the millions of passengers relying on this service.  The Award violates this public policy by reinstating a pilot who repeatedly failed to demonstrate proper airmanship abilities. The SB further exceeded its jurisdiction when overturning the discharge by relying on and misconstruing an unpled claim based on Section 17.P of the CBA.  Furthermore, an award may also be vacated if the SB denies a litigant due process.

**B.    Scope Of Individual Review Of System Board Awards Under The RLA.**

   **1.    Scope of Review**

By its terms, the RLA permits judicial review on three grounds: (a) failure of the System Board to comply with the RLA; (b) failure of the System Board to conform or confine itself to matters within its jurisdiction; and (c) fraud or corruption.  45 U.S.C. Sec. 153, First (q); *Union Pacific R.R. Co. v. Sheehan*, 439 U.S. 89, 93 (1978) (*per curiam*); *Atchison, Topeka and Santa Fe Ry. Co. v. United Transp. Union*, 175 F.3d 355, 357 (5th Cir. 1999).  Judicial review is also required under an implied fourth ground—due process.  *Brotherhood of Locomotive Engineers v. St. Louis Southwestern Ry. Co.*, 757 F.2d 656, 660-61 (5th Cir. 1999).  Finally, courts will overturn awards that contravene clear, well-defined and dominant public policies.  *See United Paperworkers Int'l Union, AFL-CIO  v. Misco, Inc.,* 484 U.S. 29, 42 (1987).

   **2.    Summary Judgment Standard**

American is entitled to judgment as a matter of law because no genuine issues of material fact exist.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-24 (1986); *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio,* 476 U.S. 574, 586 (1986).

C.    **The Arbitrator Exceeded His Jurisdiction By Reinstating An Unsafe Pilot After Finding Just Cause For Termination.**

In *Eastern Associated Coal Corp. v. United Mine Workers of America Dist. 17*, 531 U.S. 57 (2000), the Supreme Court described circumstances in which arbitration awards *should* be set aside.   An award "must draw its essence from the contract and cannot simply reflect the arbitrator's own notions of industrial justice." *Id.* at 466 (citing *Misco*, 484 U.S. at 48).   Where, as in this case, an award does not draw its essence from the contract or the award simply reflects the arbitrator's own notions of industrial justice, it should be set aside.   *Id.* (reinstatement of employee overturned where arbitrator exceeded his authority).

The Fifth Circuit recently addressed a situation similar to the present case in which it upheld a district court's decision to dismiss an arbitrator's award where the System Board went beyond its jurisdiction.   *American Eagle Airlines, Inc. v. Air Line Pilots Ass'n*, 343 F.3d 401, 405 (5th Cir. 2003).   "[I]f the relevant bargaining agreement requires just cause for dismissal, an arbitrator acts beyond its jurisdiction by fashioning an alternate remedy once it has concluded— implicitly or otherwise—that an employee's conduct constitutes just cause for dismissal, as the Board did here." *Id.* (citing *E.I. DuPont de Nemours and Co. v. Local 900 of Intern. Chem. Workers Union*, 968 F.2d 456, 459 (5th Cir. 1992); *Delta Queen Steamboat Co. v. District 2 Marine Engineers Beneficial Ass'n, AFL-CIO*, 889 F.2d 599, 604 (5th Cir. 1989), cert. denied, 111 S. Ct. 148 (1990).   Finding the award *had* imposed a new requirement outside of the agreement, the appellate court affirmed the award's dismissal. *American Eagle Airlines*, 343 F.3d at 410 (holding that, where an arbitration Board impliedly recognized that the airline had "just cause" to terminate a pilot, it was improper for the Board to look beyond the "just cause" issue and to consider an alleged subsequent labor contract violation because "the Board was

without jurisdiction to craft a remedy" for that alleged subsequent violation). This analysis for overturning an arbitrator's award is applicable in the present case.

The Arbitrator should have upheld American's termination of Minkin because the termination was for cause.   The Fifth Circuit has long held that an Arbitrator does not have to use the precise language "just cause for termination" before discharging an employee for cause. In fact, "[t]his Court has held that where an Arbitrator implicitly finds that just cause exists, he need not recite the operative phrase 'just cause.'"  *See Delta Queen*, 889 F.2d at 604 (holding arbitrator "impliedly found proper cause for discipline"); *Container Products Inc. v. United Steel Workers of America*, 873 F.2d 818, 820 (5th Cir. 1989) (finding arbitrator exceeded authority because implicit finding of just cause for dismissal was apparent from arbitrator's order).  In fact, "[t]he phrase carries no talismanic significance in labor jurisprudence.  It is simply a term of art that defines the many unrelated, independent acts that serve as grounds for employee discipline under the agreement." *E.I. DuPont de Nemours*, 968 F.2d at 458-49 (citing *Delta Queen*, 889 F.2d at 602 and *Container Products*, 873 F.2d at 820).

The Grievance on which the Arbitration hearing was based alleged that American's termination of Captain Minkin was without just cause.  Up to the time of the Arbitration hearing, it appeared the Union would in fact argue there that the termination was without just cause. However, at the Arbitration hearing, APA admitted that Captain Minkin failed to successfully and safely complete the OE phase of his transition program.  [Award, p. 11; Appx. 13 and Arb. Tr. Vol. 1, 114:8-12; Appx. 56]  APA did not dispute that four separate check airmen found serious safety deficiencies in Minkin's flying.  Nor did APA dispute that American, through the SRB process, had reached a considered determination that Captain Minkin, based on his deficient and unsafe performances during his series of "operating experiences" flights as

observed and evaluated by  various Check Airmen, no longer possessed the airmanship skills

necessary to fly a passenger aircraft.

Captain Greg Smith, the Los Angeles Chief Pilot who made the ultimate decision to

terminate Minkin, testified that American terminated Minkin due to basic safety and airmanship

deficiencies, not Minkin's failure to complete OE:

> . . . I saw that there was no progress.  I saw there was resistance to instruction and
> that the difficulties he was having did not relate to the new aircraft but related to
> basic airmanship and below-average captain abilities.
>
> All those things in mind, I believe that no further training should be allowed and
> that termination would be the most logical step.

[Arb. Tr. Vol. 2, 188:2-11; Appx. 111]

When asked why he would not simply agree to return Minkin to his captain seat on the

Super 80 aircraft (which APA requested in a letter prior to the termination[9]), Smith answered:

> I think I answered that question with the previous answer when I said that the
> difficulties that were experienced related not to the newness of an aircraft but to
> basic airmanship and below-average captain skills.  That would relate to any
> airplane, not just the Boeing 757/767.

[Arb. Tr. Vol. 2, 191:24-192:4; Appx. 112]

Neither the undisputed evidence of Minkin's failure to safely and satisfactorily complete

his OE phase nor the undisputed evidence that Minkin had developed basic airmanship problems

were questioned by the Arbitrator at the Arbitration hearing, and nor could it have been.  This

was tantamount to American having proven just case.  *American Eagle Airlines*, 343 F.3d at 410.

---

[9]     APA's  letter purported that CBA Section 17. P provided that Minkin be given an opportunity to return to
his former Super 80 position.  [Sept. 15, 2010 Letter, pp. 1-2; Appx. 298-99]   Contrary to APA's letter, however,
there was no prior practice of Sec. 17.P ever being applied to a pilot who had entered the OE phase of a transition
program.  [Arb. Tr. Vol. 2, 189:20-190:13; Appx. 111-12 and Examples of Appropriate Application of Section 17.P;
Appx. 272-97].  Instead, Section 17.P has *only* been applied to pilots in the initial phase of the program, i.e., the
training phase.  [*Id.*]  Indeed, by its terms, Section 17.P can only be applied within the first 30 days of the program
which, by definition, must be during the training phase that generally last approximately 30 days.  [CBA § 17-11 P;
Appx. 243-44]  APA decided not to make any reference to Section. 17.P in the Grievance.  [Grievance, pp. 1-2;
Appx. 257-58]

The Arbitrator improperly imposed his own views by looking beyond this just cause for termination.

**D.      The Arbitrator Disregarded Public Safety By Ordering The Reinstatement Of An Unsafe Pilot.**

The Award violates the explicit, well-defined, and dominant public policy for airline safety.[10]  The order to reinstate an unsafe pilot exposes American, and its passengers, to danger. It is well established that an air carrier has a statutory duty to perform its services "with the highest possible degree of safety in the public interest."  49 U.S.C. § 44702(b)(1)(A).  The courts recognize this safety imperative, *deferring to airlines on safety issues*.  "Courts simply do not possess the expertise with which to supplant their judgment in the best manner airlines can obtain that highest degree of safety for that of the airlines."  *Johnson v. American Airlines, Inc.*, 745 F.2d 988, 993 (5th Cir. 1984); *see, e.g., Robinson v. American Airlines, Inc.*, 908 F.2d 1020, 1023 (D.C. Cir. 1990) (noting FAA "regulations require airlines to take into account 'personal characteristics that could adversely affect safety' in determining pilot competency"); *World Airways, Inc. v. IBT, Airline Division*, 578 F.2d 800, 803 (9th Cir. 1978) (stating federal law places burden on airlines to determine whether pilot possesses necessary abilities); *Air East, Inc. v. Nat'l Transp. Safety Bd.*, 512 F.2d 1227, 1229 (3d Cir. 1975), *cert. denied*, 423 U.S. 863 (1976) (stating "[i]n legislating air travel safety, Congress has recognized the duty of air carriers is to perform their services 'with the highest possible degree of safety in the public interest,' and finding evidence of numerous airline incidents compromising public safety justified an

---

[10]      Like all contracts, courts may not enforce a collective bargaining agreement if the CBA violates public policy.  *W.R. Grace & Co. v. Rubber Workers*, 461 U.S. 757, 766 (1983).  "Such a public policy, however, must be well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'"  *Id.* (quoting *Muschany v. United States*, 324 U.S. 49, 66 (1945)).  "At the very least, an alleged public policy must be properly framed under the approach set out in *W.R. Grace*, and the violation of such a policy must be clearly shown if an award is not to be enforced."  *Misco*, 484 U.S. at 43.  The question is not whether the underlying conduct itself violates public policy, but whether the agreement to reinstate the employee does so.  *Eastern Associated Coal*, 531 U.S. at 62-63.

emergency order); *Spurlock v. United Air Lines*, 475 F.2d 216, 219 (10th Cir. 1972) ("[t]he risks involved in hiring an unqualified applicant [as a flight officer] are staggering" and "public interest clearly lies in having the most highly qualified persons available to pilot airliners").

The D.C. Court of Appeals found the "maximization of safety to be reasonably necessary to the normal operation of American Airlines." *Murnane v. American Airlines*, 667 F.2d 98, 101 (D.C. Cir. 1981), *cert. denied*, 456 U.S. 915.  The court also found that American "is in the business of managing risk factors and probabilities" and "the airline industry is one in which safety is of the utmost importance.  The staggering death tolls and resulting human suffering which have followed some of our nation's horrible air disasters attest to this fact." *Id.*  Thus, "the airline industry must be accorded great leeway and discretion in determining the manner in which it may be operated most safely." *Id.* (citing *Usery v. Tamiami Trail Tours, Inc.*, 531 F.2d 224, 236 n.30 (5th Cir. 1976)).  This deference "is in accord with American's view that 'safe' is not sufficient.  Rather, the 'safest' possible air transportation is the ultimate goal." *Id.*  [Arb. Tr. Vol. 2, 123:1-15; 124:12-21; Appx. 58 and Arb. Tr. Vol. 2, 210:24-211:11; Appx. 117]

In this case, the Award violates a well-defined and dominant public policy by requiring American to reinstate a pilot who American determined is unsafe and lacks the airmanship skills necessary to fly for American—a determination that was made after extensive review processes before the Performance Review Committee and the Systems Review Board.  [Arb. Tr. Vol. 1, 19:12-30:5; Appx. 32-35]  The Arbitrator declined to allow American to present safety evidence that it proferred, even though APA agreed that Minkin was unable to complete the transition process.  [Arb. Tr. Vol. 1, 51:14-18; Appx. 40 and Arb. Tr. Vol. 1, 114:8-12; 118:4-119:23; Appx. 56-57]  The Award instead focuses on Section 17.P, which the Arbitrator inappropriately considered after APA essentially admitted that just cause existed based on Minkin's failure to

complete OE due to his unsafe and deficient flying.  [Award, p. 11-20; Appx. 13-22]  American

was, however, able to introduce some evidence before the Board proving Minkin's safety

problems.  [Arb. Tr. Vol. 1, 123:1-124:21; Appx. 58]  As Captain Burns, American's Manager of

Flight Training, testified:

> I saw more than one write-up [from the OE flights] recounting situations where
> Captain Minkin placed the airplane and the passengers at jeopardy – that, had
> there not been a check airman in the other seat to intervene, we might be at a
> different kind of hearing today.
>
> I take that very seriously, the safety part of my job, and I determined that there
> was enough evidence there that we were going to recommend no further training
> from the training side.

[Arb. Tr. Vol. 1, 124:12-21; Appx. 58]  Compelling American to reinstate Minkin breaches

American's statutory duty to ensure passenger safety.  The Arbitrator's Award should be

overturned because it violates a statutorily defined public policy.

**E.     The Arbitrator Exceeded His Jurisdiction By Considering Section 17.P Of The Cba
         And Then Misconstruing Section 17.P.**

**1.     The Arbitrator exceeded his jurisdiction by considering and ruling on a
          matter not properly before him.**

The Arbitrator exceeded his jurisdiction by basing the Award on a CBA claim, Section

17.P, that APA did not set forth in its grievance or the submission—effectively changing the

nature of the entire proceeding.  [Award, p. 13; Appx. 15]  By considering the merits of this

Section 17.P claim, the Arbitrator exceeded his powers and fashioned an alternative remedy.

Upon Minkin's termination, APA filed a grievance on his behalf. [Grievance, pp. 1-2;

Appx. 257-58]  Throughout the administrative process, both parties approached the case for what

it was—a termination grievance.  In fact, APA's counsel said in her opening statement at the

Arbitration that:

> [t]his is a **termination grievance**, and as a result, **the burden of proof rests squarely on American Airlines to show it had just cause** to employ the harshest form of punishment upon Captain Minkin.

[Arb. Tr. Vol. 1, 37:22-25; Appx. 36 (emphasis added)]   However, despite the fact that the parties brought a *termination grievance* before the Board, the Arbitrator created an entirely new case, looked beyond the "just cause" requirement, and fashioned his own remedy based upon a claim that was not properly before the Board.   He then went on to order reinstatement of an unsafe pilot based on that claim.  [Award, p. 20; Appx. 22]

The inconsistencies between the case that was pled and the case that was tried are apparent given the Grievance as well as the Submission issue statement, on one hand, and how the Arbitrator purported to frame the issue statement on the other.   The two simply cannot be aligned.  APA's Submission statement of the issue read as follows:

> Did the Company have just cause to terminate the Grievant, Captain Ronald Minkin, on October 6, 2010 and if not, what is the appropriate remedy?

[Award, p. 2; Appx. 4]  This is the issue that was pled and the issue upon which American was prepared to arbitrate.   However, the Arbitrator side-stepped the submission issue, allowed APA to try a case based on its unpled Section 17.P claim (despite American's objections), and ultimately based his ruling on this unpled claim.  [Award, p. 11; Appx. 13]  The Award stated:

> [i]t is clear from a review of the record and the briefs of the parties that the System Board must decide whether Section 17.P applies to the Grievant's situation. If it does, then the termination of the Grievant was in violation of the Agreement and, therefore, was not for just cause. On the other hand, if it is found that Section 17.P does not apply to the instant case, then termination of the Grievant must be found to be for just cause.

[*Id.*]  The Arbitrator then acknowledged that "it is true that there is no mention of Section 17.P in the grievance or the Submission to the System Board," yet found that "[t]o find in favor of the

Company because Section 17.P was not mentioned in either the grievance or the Submission to the System Board would clearly place form over substance." [Award, p. 13; Appx. 15]

The Arbitrator thus exceeded his jurisdiction by looking beyond the "just cause" issue and basing his decision on the unpled Section 17.P claim, despite Fifth Circuit case law stating that the arbitrator has no authority to proceed further after an implicit or explicit finding of just cause. *See, e.g., E.I. DuPont de Nemours & Co. v. Local* 900, 968 F.2d 456 (5th Cir. 1992); *Delta Queen*, 889 F.2d at 604. Because the Arbitrator reframed the issue and changed the nature of the proceeding, the resulting Award failed to draw its essence from the Agreement. *See Bruce Hardwood Floors v. UBC,*103 F.3d 449, 452 (5th Cir. 1997) ("Where the arbitrator exceeds the express limitations of his contractual mandate, judicial deference ends and vacatur or modification of the award is an appropriate remedy."); *Exxon Corp. v. Baton Rouge Oil*, 77 F.3d 850, 853 (5th Cir. 1996) ("The district court may vacate an arbitrator's award if the arbitrator exceeded its arbitral authority provided for in the agreement."); *Houston Lighting & Power Co. v. I.B.E.W.,* 71 F.3d 179, 182 (5th Cir. 1995); *Container Products, Inc. v. United Steelworkers of America*, 873 F.2d 818, 820 (5th Cir. 1989).

### 2.    The Arbitrator exceeded his jurisdiction by misconstruing Section 17.P.

Furthermore, the Arbitrator exceeded his jurisdiction because he misconstrued Section 17.P. Section 17.P is not applicable to the case at hand because it may only be invoked by American, not APA, and has never been applied to a situation like Minkin's. [Arb. Tr. Vol. 3, 363:25-22; 367:17-369:5; 389:5-25; 390:25-391:13; 393:4-395:17; Appx. 189-190; 196-97; Examples of Appropriate Application of Section 17.P; Appx. 272-97] However, the Arbitrator disregarded past practice and relied on sources other than the CBA to interpret Section 17.P. [Award, pp. 11-20; Appx. 13-22]

Before dispensing his own remedy, the Arbitrator admitted that American had just cause to terminate Minkin's employment if Section 17.P did not apply.[11]  [Award, p. 11; Appx. 13] Once this determination of just cause was made, the Board lacked further authority to fashion an alternate remedy and the Arbitrator should have dismissed the grievance.  *See American Eagle Airlines*, 343 F.3d at 405.  However, the Arbitrator decided to proceed, exceeding his jurisdiction, by addressing the merits of Section 17.P and fashioning his own remedy.  During this process, he misread Section 17.P.  The term "qualified," as used in the section, refers only to the first phase of the instruction process, which culminates when the pilot receives his FAA "ticket."  Minkin had earned his ticket and was in the next stage, the OE phase, when his piloting deficiencies and safety violations came to light.  Thus, because Minkin was beyond the "qualifying" stage, Section 17.P could not have applied to his situation even if the situation were appropriate *and* American chose to invoke the provision.  American further provided proof that Section 17.P had never been applied in Minkin's situation.  [Examples of Appropriate Application of Section 17.P; Appx. 272-97]  Therefore, the Arbitrator improperly applied Section 17.P to the case at hand and the resulting Award exceeded his jurisdiction.

## F.     The Arbitrator Violated American's Due Process Rights.

The Arbitrator violated American's due process rights by trying a different case than that which was pled and by inhibiting American's ability to mount its defense.  The Fifth Circuit has held that it is a deprivation of a party's due process rights for a reviewing board to prevent the

---

[11]     The Award read as follows:

It is clear from a review of the record and the briefs of the parties that the System Board must decide whether Section 17.P applies to the Grievant's situation.  If it does, then the termination of the Grievant was in violation of the Agreement and, therefore, was not for just cause.  On the other hand, if it is found that Section 17.P does not apply to the instant case, then termination of the Grievant must be found to be for just cause.

[Appx. 13]

party from presenting its defense.  *Hall v. Eastern Air Lines, Inc.*, 511 F.2d 663, 663-64 (5th Cir. 1975) (per curiam).  In *Hall*, the Fifth Circuit held that the Board's procedure deprived the grievant, Hall, of fundamental due process by denying an opportunity for him to present his alibi defense.  *Id.* at 664.  The court further noted that "a refusal to consider the evidence was not harmless; the Board itself recognized that if the facts Hall relied on were true, they would constitute a complete defense to his discharge.  The presentation of one's defense is a basic due process right, and the district court properly remanded the case to afford Hall the opportunity to exercise that right in a de novo hearing."  *Id.*

Before, and even during, this Arbitration, the parties treated the case as a termination proceeding in which American had the burden to demonstrate just cause for Minkin's termination.  [Arb. Tr. Vol. 1, 37:22-25; App. 36 and Grievance, pp. 1-2; Appx. 257-58]  During the arbitration, however, the Arbitrator refused to allow American to defend its actions by addressing Minkin's piloting deficiencies.  [Arb. Tr. Vol. 1, 118:4-119:23; Appx. 57]  This deprivation led to the exclusion of relevant evidence, including testimony by multiple check airmen stating that the OE phase revealed Minkin had become an unsafe pilot.  [Declaration of Gregg Formella, ¶¶ 5-6; Appx. 308]  Thus, the Award cannot stand because American's due process rights were violated.

## VI.
## <u>CONCLUSION</u>

For the above reasons, Plaintiff American Airlines, Inc. asks this court to grant it summary judgment.

Respectfully submitted,

    /s/   *Roger C. Diseker*
Dee J. Kelly
State Bar No. 11217000
Roger C. Diseker
State Bar No. 00787371
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone:  (817) 332-2500
Facsimile:  (817) 878-9280
Email:  dee.kelly@kellyhart.com
Email:  roger.diseker@kellyhart.com

**ATTORNEYS FOR PLAINTIFF
AMERICAN AIRLINES, INC.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 25th day of June, 2012, I electronically filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  The electronic case filing system sent a "Notice of Electronic Filing" via electronic mail on that date to counsel for all parties of record listed below.

| | |
|---|---|
| Sanford R. Denison | Steven K. Hoffman |
| Baab & Denison, LLP | Jeff Vockrodt |
| Stemmons Place, Suite 1100 | James & Hoffman, P.C. |
| 2777 N. Stemmons Freeway | 1130 Connecticut Avenue, NW, Suite 950 |
| Dallas, Texas 75207 | Washington, D.C. 20036 |
| Telephone:  (214) 637-0750 | Email:  skhoffman@jamhoff.com |
| Email:  denison@baabdenison.com | Email:  jvockrodt@jamhoff.com |

**ATTORNEYS FOR DEFENDANT
ALLIED PILOTS ASSOCIATION**

    /s/   *Roger C. Diseker*